## McQUARTERS v. DUCOTE.
### No. 12152.

Court of Civil Appeals of Texas.
San Antonio.
Nov. 1, 1950.

Rehearing Denied Nov. 29, 1950.

Oxford & Ramsour, Edinburg, for appellant.

Strickland, Wilkins, Hall & Mills, Mission, for appellee.

POPE, Justice.

This is an action for alienation of affections in which the trial court sustained appellee's motion for instructed verdict.

Appellant, Pearl L. McQuarters, sued Bertie Ducote, a widow, claiming that she had alienated the affections of Mrs. McQuarters' husband, Fred G. McQuarters. Mr. and Mrs. McQuarters had been married for fifteen years with no prior separation or serious marital difficulty. Bertie Ducote at the time of the trial was seventy-four years old and had resided at Mission, Texas, for many years. Mr. McQuarters had known her in his younger years, while serving in the army at Mission, Texas, during some border trouble. Mr. McQuarters was shown to be a retired army sergeant who at the time of the trial was sixty-two years of age and a resident of the Old Soldiers Home in Washington, D. C.

In 1945, upon his retirement from the army, Mr. McQuarters and his wife moved to the Rio Grande Valley. Before moving, Mr. McQuarters, with his wife's consent, wrote a letter to Bertie Ducote concerning his retirement and their plans to move to the Valley. With appellant's consent, he then made two trips south in an effort to purchase a home, and while on his last

trip phoned his wife from Bertie Ducote's house, reporting that he had bought a home in McAllen, Texas. During this trip Mrs. Ducote upbraided her neighbors for being "nosey" about the presence of a man in her home. After his return to his wife in Mississippi, Mr. and Mrs. McQuarters moved to Mission and resided with Bertie Ducote while some repairs were made on their new home.

Appellant points to several incidents between the parties in support of her claim. Bertie Ducote was suffering some pain in one of her limbs and Mr. McQuarter, always in the presence of his wife and with her consent, undertook to relieve this infirmity by nightly applications of "horse medicine", a technique he acquired in caring for horses while in the army. During one treatment, also in the presence of his wife, he jokingly made a vulgar remark to his patient. Appellant testified that on another occasion she saw Bertie Ducote leave her husband's room. Appellant, after two months in the Ducote home, insisted that she and her husband should move into their own home, which they did. The next incident between the parties occurred when Bertie Ducote appeared at their new home in McAllen on "circus day". She and Mr. McQuarters went to the circus together, but, other than this single fact, none of the surrounding circumstances appear in the record. Two days later Mr. McQuarters separated from his wife and filed a suit for divorce.

Some time after this separation, Mr. McQuarters' kinsmen found him at Bertie Ducote's home and persuaded him to return to his wife. He again left home on two occasions, and each time was later found at the Ducote home. On each of these three occasions, he was helplessly drunk when found, and whiskey bottles abundantly adorned the room. Each time he was found in bed, late at night with the lights out. There were several rooms in the Ducote home, but the witnesses who testified about the home did not visit these other rooms and did not know who was occupying them. Appellant, though she had previously lived in the home and the matter was in issue during the trial, did not describe into the record the arrangement of the rooms.

Sometime during these transactions, Mr. and Mrs. McQuarters composed their differences and he dismissed his divorce suit; but later the strife erupted anew and she commenced a divorce suit, which at the time of trial had not been tried.

Mr. McQuarters received retirement pay of two hundred dollars each month, but on two of the occasions when he was taken from Bertie Ducote's home at night he asked her for money. She gave him a total of forty dollars. On two occasions, before leaving he said he wanted to kiss his "honey" goodbye. He did kiss her one time, but the evidence shows that on the other occasion his kinsman "steered him over to her and he put his arm around her," whereupon, instead of kissing her, he asked her for money.

To establish this character of action the plaintiff must prove (1) that the defendant intentionally or purposely enticed away the spouse, (2) that there has been loss of affection or consortium, and (3) that defendant's conduct was the controlling cause of the loss. Williams v. Rearick, Tex.Civ.App., 218 S.W.2d 225; Collier v. Perry, Tex.Civ.App., 149 S.W.2d 292; Kahn v. Grothaus, Tex.Civ.App., 104 S.W.2d 932; Crespi v. Wigley, Tex.Civ. App., 18 S.W.2d 716, 717; Rhodes v. Meloy, Tex.Civ.App., 289 S.W. 159; Burnett v. Cobb, Tex.Civ.App., 262 S.W. 826.

Inaction is not enough to subject one to liability for alienation of affections. It is necessary that there be some act on the part of the defendant intended to accomplish that result. One does not become liable for alienation of a husband's affections merely because, without encouragement on her part, she becomes the object of another's affections. Restatement, Torts, § 683(e).

In Norris v. Stoneham, Tex.Civ. App., 46 S.W.2d 363, the single authority relied upon by appellant, it was proved that the defendant was living in adultery with the plaintiff's husband, whom the defendant knew was a married man. The court in that case properly supported its decision

by the citation of authorities pertaining to criminal conversation. When it is proved that a defendant's acts are inherently wrongful and seductive, actual intent to alienate affections as well as the loss of consortium may be presumed, Smith v. Smith, Tex.Civ.App., 225 S.W.2d 1001, but one presumption may not be built upon another presumption. Williams v. Rearick, Tex.Civ.App., 218 S.W.2d 225, 229; Houston Fire and Casualty Co. v. Biber, Tex. Civ.App., 146 S.W.2d 442. In the instant case the evidence wholly fails to prove adultery and we do not presume its existence.

Appellant and her husband initiated the original meeting with the appellee. They then moved into appellee's home and lived with her. When they were prepared to move to their own home, appellee did not dissuade either of them from moving to McAllen. Other than the single instance when Bertie Ducote openly visited her former guests at the McQuarters' home in McAllen on circus day, she initiated no meetings or relations with either Mr. or Mrs. McQuarters. This visit occurred in open day and appellant failed to testify concerning any protest or objection on her part, or any of the other surrounding facts occurring at the time. We do not feel compelled to supply this or any other deficiency from the multitude of possible situations which may be imagined. When a party is in possession of facts which she does not see fit to divulge, we do not feel that it is our prerogative to presume proof that she is charged with making. Western Union Telegraph Co. v. Mobley, Tex.Civ.App., 220 S.W. 611, on certified question, 112 Tex. 528, 249 S.W. 182.

Bertie Ducote, according to the evidence, never sought after or sent for Fred McQuarters. She never meddled with the McQuarters' family relationship by telephone, by letter, by visits to their home, or by surreptitious dates. Two times she advanced him small sums of money upon his request. During the period of more than three years, over which the above transactions occurred, appellant was able to point to a single instance that Bertie Ducote tolerated a kiss from Mr. McQuarters. In this he was the moving party. There is no showing that at any time she persuaded, enticed, or induced him to leave or to stay away from home. Three times Mr. McQuarters was found at the Ducote home, but how long he had been there is not developed. The proof does show that he was living out of a suitcase, which dispels any idea of a permanent residence. The most that the proof shows is that over a period of more than three years, there occurred some partially explained misdeeds by appellant's spouse who, in his retirement, had taken to excessive drink.

Suits of this nature have been outlawed in some jurisdictions because they had become a vehicle for abuse and even blackmail. While this jurisdiction recognizes them as a valid means to preserve the family relationship against despoilers, they must be grounded upon the intentional wrongdoing of a stranger to the marriage relationship rather than the wickedness of a recreant spouse. They are intended to compensate a spouse for a wrongdoer's active interference with the family status, but may not be used to reward a wife for the misdeeds and weaknesses of her own husband. Appellant had the burden of showing that Bertie Ducote was the active and controlling cause of any alleged loss or alienation of affections, and in this we feel that she has failed in her proof. Williams v. Rearick, Tex.Civ.App., 218 S.W.2d 225, 229; Kahn v. Grothaus, 104 S.W.2d 932; McGregor v. McGregor, Ky., 115 S.W. 802; Steele v. Werner, 28 Cal.App.2d 554, 83 P.2d 56; McCracken v. Cohen, 322 Mass. 12, 75 N.E.2d 501; Foster v. Copeland, 27 Tenn.App. 777, 159 S.W.2d 96.

The judgment is affirmed.